UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
16-CR-277 (DWF/KMM)

UNITED STATES OF AMERICA,

               Plaintiff,

          v.

JESSE VANG,

               Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

## Introduction

On June 4, 2020, Defendant Jesse Vang filed a three-page, pro se motion asking the Court for compassionate release, a sentence reduction, or home confinement. (Dkt. 53).  In his motion, Vang did not identify any medical issues making him particularly vulnerable to COVID-19; he focused on facts that he believed would demonstrate that he is a changed man who would lead a productive life and support his children if released. (*Id.*). On July 20, Vang filed a second (or supplemental) pro se motion for compassionate release (Dkt. 56), this time attaching seven exhibits, including some of his medical records (56-2, 56-3, 56-5), a copy of a request he made to the warden for compassionate release (56-6), and a proposed release plan (56-7). Among other things, these

records show that Vang has already contracted the COVID-19 virus, and that he has fared relatively well, having lost his sense of smell and experienced shortness of breath and coughing "here and there." (Dkt. 56-6 at 1). The Court ordered the government to provide a response by July 27, 2020.

The United States respectfully opposes the motion. This Court should deny Vang's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), with prejudice because Vang has not met his burden of establishing that a sentence reduction is warranted under the statute. The Court should deny Vang's request for an order directing BOP to transfer him to home confinement because it is without jurisdiction to grant such relief.

## Factual Background

### I.    Procedural History

On February 28, 2017, Vang pled guilty to conspiracy to distribute methamphetamine in violation of 21 U.S.C §§ 841(a)(1), 841(b)(1)(B), and 846. (Plea Agreement, Dkt. 34). On November 28, 2017, this Court sentenced him to 72 months of imprisonment. (Judgment, Dkt. 49 at 2). Vang has served approximately half of his sentence.

On April 23, 2020, Vang sent an email to the warden at FCI Milan, stating that he had requested Compassionate Release on April 15, 2020. (Dkt. 56-6 at 2). On June 17, 2020, Vang submitted a form entitled "Inmate Request to Staff" asking the warden for Compassionate Release.  (Dkt. 56-6 at 3). The

Government does not have any records indicating whether Vang's request was denied or granted.  For purposes of this response, the Government presumes the warden either did not respond to, or denied, Vang's motion.

Vang's BOP records show that on April 5, 2020, he reported to his housing manager that he believed he had a fever, and he had some other symptoms including chills and diarrhea. (Dkt. 56-3 at 17). That day, Vang's temperature was measured at 100.8 degrees, and he was immediately placed into isolation/quarantine so that he could get a COVID test. (*Id.* at 17-18, 20). Vang was given a COVID test on April 10, and the test came back positive on April 15, 2020. (Govt. Exh. 1 at 4; Govt. Exh. 2 at 10.) He was released from quarantine on April 12, 2020, with no restrictions. (Dkt. 56-2 at 12). By May 1, Vang was deemed "COVID recovered." (Govt. Exh. 1 at 4; Exh. 2 at 10.)

During the time Vang was experiencing the COVID illness, he had various flu-like symptoms that appear to have been relatively minor.  For example on April 9, four days after he was first measured as having a fever, Vang reported having a cough, but he no longer had a fever. His records confirm that his temperature was 98 degrees that day. (Dkt. 56-2 at 6). In fact, BOP medical records show the only day Vang had a fever was on April 5. (Dkt. 56-2 at 3). On April 12, medical personnel noted that Vang was alert, oriented, his lungs were clear, he denied having any symptoms, and he could be released back to general population. (Govt. Exh. 2 at 11).

On April 29, Vang reported that he was still experiencing a loss of smell and shortness of breath, but had no other symptoms. (*Id.* at 7). That same day, radiology images (presumably a chest X-ray) showed that Vang's lungs were clear and his "cardiac silhouette" was normal. (*Id.* at 80). At a medical appointment on June 1, 2020, Vang reported having no lingering symptoms other than loss of his sense of smell, and an intermittent loss of his sense of taste. (Govt. Exh. 2 at 1). On that date, he denied having any other symptoms such as cough, difficulty breathing, aches, fever, or chills. (*Id.*) The physician noted that Vang seemed to be "perseverating over loss of smell and taste from prior covid" and recommended that he be referred for psychological help in coping with his feelings. (*Id.* at 2). In his motion, Vang claims that his lingering effects from having Covid-19 are that he has lost his sense of smell and experienced shortness of breath and coughing "here and there." (Dkt. 56-6 at 1).

## II.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as

events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission,

all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates such as Vang have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

According to the BOP website, FCI Milan – where Vang is currently placed – has just *three* active covid-19 cases among inmates, and *one* active case among a staff member, as of the date of this filing. https://www.bop.gov/coronavirus.  A total of 90 inmates, including Vang, have tested positive for Covid-19. This is far fewer than Vang claimed existed when he filed his motion on June 20, when he reported that the facility had 134 confirmed cases. (See Dkt. 56 at 2). At any rate, while FCI-Milan does not have a perfect record, the number of positive tests and the manner in which Vang was treated (and recovered), shows that the facility is succeeding in staving off the epidemic and that it is well-equipped to successfully treat inmates who contract the virus.

## III.  Vang's Motion for Compassionate Release

Vang claims that Covid-19 factors combined with his rehabilitation show "compelling" circumstances justifying a reduction of his sentence.  Vang admits that rehabilitation, alone, would not justify compassionate release. (Dkt. 56 at 16).

## Arguments

In this case, Vang cannot meet his burden to show that he is eligible for a sentence reduction in the form of compassionate release. Additionally, the Court should deny Vang's motion for home confinement because the Court is without jurisdiction to grant such relief.

## I.   The Court Can Consider Vang's Motion Because He Has Exhausted His Administrative Remedies.

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

Vang appears to have filed at least one request with the warden, and more than 30 days have elapsed since he did so. (Exhibit 56-6). Therefore, it appears he has met the exhaustion requirement. Where the exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, Vang bears the burden to establish that he is eligible for a sentence

11

reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

It is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted). While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to release an inmate to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of on an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. *See also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

## II.     The Court Should Deny The Motion Because Vang Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction.

The Court should deny Vang's motion for a reduction of his sentence because he has not identified "extraordinary and compelling reasons" for that reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement.

The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A). For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into any of the categories and therefore could not alone provide a basis for a sentence reduction. *See United States v. Fry*, 2020 WL 1923218 at *1 (D. Minn. Apr. 21, 2020) ("To merit such compassionate release, Fry must show more than a mere speculation of the possibility of contracting the virus."). The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular

14

prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[1]

Vang's compassionate release motion is based around his COVID-19 diagnosis earlier this year. It has already been more than three months since Vang tested positive for the virus (and possibly longer since he actually became infected), and his own exhibit shows that he was released from quarantine on April 12, 2020, with no restrictions. (Dkt. 56-2 at 12). Vang currently reports only loss of smell, along with occasional shortness of breath and coughing. His lungs and heart have been tested and found to be clear of symptoms. Everyone

---

[1] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

certainly hopes that Vang's post-COVID-19 recovery continues to be one without long-term complication, regardless of the impact on his motion for release. However, the fact that he contracted COVID-19 does not change the correct result in regards to his motion. Vang is a young man who appears to have recovered from COVID-19 with minimal lasting impacts, in which case he will presumably have developed at least some level of immunity, and his situation vis-à-vis COVID-19 will be better than the vast majority of Americans.

Another court in the Eighth Circuit addressed a similar scenario in *United States v. Brunston*, 18-CR-40145-KES (D.S.D., May 26, 2020). There, a 37-year-old prisoner tested positive for COVID-19 while also suffering from severe chronic medical conditions including Type 2 diabetes, asthma, hypertensive heart disease with heart failure, hypertension, sleep apnea, epilepsy/seizure disorder, and kidney disorder. *Id*. at 2. During his 14-day observation period, he did not experience coughing, muscle pain, fatigue, sore throat, loss of taste or smell, chills, or fever. *Id*. The court denied his request under § 3582(c)(1)(A), notwithstanding his elevated risk:

> [A]lthough Brunston has medical conditions that theoretically put him at a higher risk for severe illness, that has not been the case as of yet. It has been two weeks since Brunston tested positive, and his condition remains stable. . . . [T]he court finds that Brunston does not satisfy the criteria under USSG § 1B1.13 comment

16

note 1(A) because his medical condition has not substantially diminished his ability to provide self-care within the correctional facility environment.

*Id.* at 6-7.

Moreover, Vang does not present any condition putting him at greater risk for an adverse outcome were he to be re-infected. *See, e.g.*, *United States v. Zahn*, 2020 WL 3035795, at *2 (N.D. Cal. June 6, 2020) (Lompoc inmate has recovered; while there is no certainty about the risk of reinfection, "Even so, the immediate threat to Zahn has passed, fortunately with no serious complications of any kind. That is enough to find that he has not proffered an extraordinary and compelling reason for release under 18 U.S.C. § 3582(c)(1)(A)(i)."); *United States v. Kim*, 2020 WL 3213312 (D. Haw. June 15, 2020) (same); *United States v. Curtiss*, 2020 WL 3146506, at *2 (W.D.N.Y. June 15, 2020) (same); *United States v. Kelley*, 2020 WL 2747887 (N.D. Cal. May 27, 2020) (relief denied; defendant is positive and expected to recover, and has no risk factor); *United States v. Gregory*, 2020 WL 3036001 (N.D. Ill. June 5, 2020) (66-year-old Elkton inmate recovered, has no ill effects); *United States v. Purry*, 2020 WL 2773477, at *2 (D. Nev. May 28, 2020) (Lompoc inmate tested positive and is asymptomatic; he is being cared for, and release is not warranted); *United States v. Zubkov*, 2020 WL 2520696 (S.D.N.Y. May 18, 2020) (denied for inmate who recovered from COVID-19); *United States v. Lowman*, 2020 WL 3472923, at *5 (W.D.N.C. June 25, 2020) ("The sole fact that Defendant tested

positive for COVID-19 has little impact on this Court's analysis. Many people who test positive for COVID-19 may be asymptomatic or may only have a minor case that is far from life threatening"; denied based on 3553(a) factors and violent nature of offense); *United States v. Houghton*, 2020 WL 2992189 (D. Or. June 4, 2020) (denied to Terminal Island inmate who has tested positive, and presents no risk factors); *United States v. Vargas*, 2020 WL 3056794 (D. Or. June 9, 2020) (Lompoc inmate tested positive but remained asymptomatic; has asthma; consideration of all factors supports denial); *United States v. Raymer*, 2020 WL 3451855, at *4 (E.D. Tex. June 23, 2020) (inmate who tested positive and remained asymptomatic does not present extraordinary reason); *United States v. Daza-Cortez*, 2020 WL 3451959 (W.D. Wash. June 24, 2020) (Yazoo City inmate recovered, and presents no other risk factor); *United States v. Rumley*, 2020 WL 2499046 (W.D. Va. May 14, 2020) (Butner inmate tested positive, has minor symptoms; motion denied).

If Vang does develop later complications, or is reinfected, he will be treated by BOP. And if his physical condition is later found to have substantially deteriorated as a result of any complications such that she then may be able to demonstrate "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A)(i), he may again move for relief. At this point, Vang cannot make such a showing and the Court should deny his motion.

**III.   This Court Has No Authority to Direct the BOP to Place Vang in Home Confinement.**

Vang has also asked that this Court order BOP to place him in home confinement or recommend that BOP place him in home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). *See also United States v. James*, 2020 WL 1922568 at *2 (D. Minn. Apr. 21, 2020); *United States v. Brown*, 2020 WL 1922567 at *2 (D. Minn. Apr. 21, 2020); *United States v. Kluge*, 2020 WL 209287 at *3 (D. Minn. Jan. 14, 2020). Because Harris' request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c).

Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because Vang offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.

## Conclusion

For these reasons, this Court should deny Vang's motion for a sentence reduction.

Date: July 27, 2020

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

By: ___*s/ Amber M. Brennan*___
Amber M. Brennan
Assistant United States Attorney